Sneed, J.,
delivered the opinion of the Court.
*489 This litigation is between a number of commercial firms of Memphis, and the defendant, as tax collector of the privilege tax of Shelby county, to determine the validity of an assessment upon that portion of the capital of the plaintiffs used in the purchase, by them, of merchandize sold to non-residents and. sent beyond the limits of the State. The controversy, as initiated in the Court below, involves the question of the constitutionality of the entire tax upon the occupation of the merchant, except such as is founded upon the ad valorem principle; but, since a recent decision of this Court at Nashville, in the cause of Jenkins v. W. G. Ewin, Clerk, declaring the constitutionality of the tax upon the capital used by merchants in the purchase of goods sold within the limits of the State, that question has been abandoned. There are seven different cases involving the same question, which have been heard and considered together. One of these cases is before us by appeal in error from the judgment of the Circuit Court, in favor of the defendant, upon an agreed case — and the six others by appeal in error from a judgment of the Circuit Court, dismissing the plaintiffs’ petitions for certiorari and supersedeas. The facts necessary to be considered in all the cases, except as to the amount of assessment, are set forth in the agreed case of Hill, Terry & Mitchell, and are as follows:
1. That said firm of Hill, Terry & Mitchell, are wholesale merchants, doing business in the city of Memphis, as boot and shoe merchants, and that J. Harvey Mathes is the legally authorized and appointed *490 tax collector of all taxes' levied on licenses and privileges, in the county of Shelby, for State and county purposes.
2. That the largest stock of goods held on hand by said firm, at any time, from the 11th day of February, 1871, to the 11th day of February, 1872, was one hundred and forty-nine thousand seven hundred and forty-nine dollars.
3. That of this amount — twenty-nine per cent, of the capital, was used in the purchase of goods sold to persons residing in the State of Tennessee, and the balance — or seventy-one per cent, was used in the purchase of merchandize, sold by the said firm, to nonresidents of the State of Tennessee, and sent beyond the limits of said State.
4. That for the aforesaid period of one year, between the 11th day of February, 1871, and the 11th day of February, 1872, the said firm had a license to do business as wholesale merchants, and were assessed for the taxes as follows: Ad valorem tax on the whole amount of capital, $1,625.00; license tax on same, $1,625.00, making the total assessment $3,250.00.
5. That of this amount, the said firm has paid as follows: ad valorem tax on the whole amount of capital, $1,625.00; license tax on 29 per cent, sold in the State, $471.25, making a total of $2,096.25.
6. That the balance of $1,153.75, claimed by the said tax collector, to be still due, is the license tax on the 71 per cent, of the capital used by the firm in the purchase of merchandize sold to non-residents, and sent beyond the limits of the State, which when *491 paid, would constitute the whole amount of tax assessed by the said collector, as the license tax of the ■said firm under existing laws.
7. That in making its returns, the said firm exhibited to the said tax collector, a statement showing not only the largest amount invested in stock on hand at any one time, but also showing how much thereof was used in the purchase of goods, sold to non-residents and sent beyond the State, and claimed that in determining the amount of tax to be paid for license, the said collector should only assess the said license tax on as much of the capital as was used in the purchase of goods sold to residents of the State, and should not assess any license tax on so much of the capital as was used in the purchase of merchandize sold to non-residents, and sent beyond the State.
8. The said tax collector refused to so assess the said tax, and demanded payment in the full sum of $1,625.00 for license tax, that being an amount equal to the ad valorem tax on the whole capital of said firm, and refused to issue licenses to said firm, but by agreement, received the foregoing amounts tendered by the said firm, and gave his receipt therefor, with the stipulation and agreement, that the said partial payment was not received as a full settlement of the State and county tax against said firm, and should in no way bar or delay legal proceedings for the collection of the same; further payments having been refused by the said firm.
We understand that all other questions involved in the proceedings by certiorari are abandoned, except the *492 legality of assessment upon the capital used in the purchase of merchandize sold to non-residents, and sent beyond the limits of the State. And in the argument of that question, two propositions are insisted upon by the counsel for the defendant. First, that the assessment is valid under the law; and second, that if the same be held to be illegal, that the writ of certiorari is not the remedy by which the plaintiffs can be relieved.
Upon the first question we have no difficulty, and must pronounce any law which authorizes a tax greater than the ad valorem tax upon that portion of the merchants capital, used in the purchase of merchandize which is sold to non-residents, and sent beyond the limits of the State, as unconstitutional and void. ,.
The taxing power is an essential incident of sovr ereignty. The only limitations upon it must be sought in the organic law. It is not conferred by constitutions — but we look to them only for the limitation upon it. ' If they do not exist in the Constitution they do not exist at all, and the State is left to measure the exercise of this tremendous power by its necessities alone. It may create its own sources of revenue, and determine at discretion what shall be taxable and what not taxable — if the organic law itself has not restricted this discretion. In reference to the powers of general taxation in this State, the only limitation upon the discretion is in the principle of equality. But there are certain occupations which, it seems, are beyond the protection of this principle, which, upon policy, can only be defended upon the argument *493 that the burthens should fall not alone upon actual values, but upon profits. And the discrimination against capital thus invested, can only be justified on account of what may be termed its productive versatility, as contrasted with other species of taxable property. And the credit of the merchant is part and parcel of his capital in the sense of the Constitution. Thus, the investment of the farmer, whose capital is in his lands, yields in its sluggish per centum but a tithe perhaps, of the actual profit which might accrue, if that capital were invested in active and successful merchandize. And hence, the framers of the Constitution of 1834 and 1870 alike, in providing that all property shall be taxed according to its value — that the taxes shall be equal and uniform — and that no one species of property shall be taxed higher than any other species of property of the same value, have distinctly announced the principle of equality, as to the taxation of capital invested in land and other property, but have quite as distinctly discriminated against capital invested in merchandize, by the blunt provision to that section: “but the Legislature shall have power to tax merchants, peddlers, and privileges, in such manner as they may from time to time direct.” In a case already referred to, it has recently been held by this Court, that this proviso was intended as a palpable discrimination against the occupations and classes therein mentioned, and that the power of taxation as to them, is left to the sound discretion of the legislative department. Under this proviso, the Legislature has authorized a.n assessment upon the capi *494 tal of merchants, used in the purchase of merchandize sold in this State, upon the ad valorem principle, and upon the occupation also to the same extent. To this extent the plaintiffs have yielded the controversy, and now only controvert the right to impose the occupation tax upon that portion of their capital used in the purchase of goods sold by them to non-residents, and sent beyond the limits of the State. They admit the validity of the ad valorem assessment upon the whole capital, and the occupation tax upon so much of it as is used in' the purchase of goods sold within the limits of the State, and this portion of the tax they have paid. The provision under which they claim this exemption is founded in a wise policy. The taxes imposed upon the merchant must come back to him at last from the consumers of his goods, in the shape of enlarged profits. And the policy was to enable our own merchants to compete successfully in the sale of merchandize to non-residents, by alleviating the burthens upon it. To that end it is provided in the same section, and immediately following the power to tax the occupation, that “the portion of the merchant’s capital, used • in the purchase of goods sold by him to non-residents, and sent beyond the State, shall not be taxed at a rate higher than the ad valorem tax upon property”: Const, art. 2, s. 28. It is a rule of interpretation, said Marshall, C. J., that the exception of a particular thing from general words, proves that in the opinion of the law-giver, the thing excepted would be within the general clause had the exception not been made, and this rule is quite as *495 applicable to the Constitution as to other instruments: Brown v. Maryland, 12 Wheat, 438; 7 Curt., 264.
The power to tax the occupation of the merchant at discretion, undoubtedly exists, as this Court has held, under that clause which authorizes the taxing of merchants, peddlers, and privileges, in such manner as the Legislature may from time to time direct — but the exception is, that so much of his capital as is used in the purchase of goods, which are sold by him to non-residents, and sent beyond the limits of the State, shall only be burthened with the ad valorem tax as upon property. The clause should be interpreted to read, that so much of merchant’s capital as is used by him in the purchase of goods, sold to non-residents, shall not be subject to the occupation tax, but only to the ad valorem tax, This clause was incidentally construed in the case of Jenkins v. W. G. Ewin, Clerk, ante p. 456, already referred to. The controversy in that case was, whether or not the clause giving the Legislature discretion to tax merchants, peddlers, and privileges, violated the principle of equality, and whether it was intended as a discrimination. It was contended on behalf of the merchant, that the clause had reference merely to the method of assessment and collection, and that being such a broad departure from the principle of equality, it could not have been intended as a discrimination, authorizing a greater tax upon merchants than the ad valorem tax upon property. The court took the opposite view, and it' was said, arguendo, “that the convention adopted the construction as well as the language of the Consitu *496 tion of 1834, is placed beyond all controversy by the clause in the Constitution of 1870, which follows that under consideration. It is as follows: The portion of a merchant’s capital used in the purchase of merchandize sold by him to non-residents, and sent beyond the State, shall not be taxed at a rate higher than the ad valorem tax on property.” This language, say the Court, “conveys the necessary implication that that portion of a merchant’s capital used in the purchase of merchandize sold by him to residents of the State, could be taxed higher than the ad valorem tax on other property; and therefore, it was necessary for the protection of wholesale merchants, that this clause should be inserted, to prevent them from being subjected to higher taxes than the ad valorem tax on property. If the Convention did not understand the preceding clause as permitting the Legislature in their discretion, to tax merchants higher than the ad valorem tax on property, then this last clause was entirely a work of supererogation.”
It is scarcely necessary to pursue this branch of the case further. The history of this proviso is well known. There was in the Convention of 1870, a very energetic opposition to engrafting upon the New Constitution, the clause of the Old Constitution which seemed to operate so harshly and invidiously against the commercial community. We refer to that' clause which excludes merchants, peddlers, and privileges, from the protection of the principle of equality. When, however, it was finally adopted, a solemn protest was presented against it by the representatives of large *497 commercial constituencies. And shortly thereafter, the clause now in question was brought forward and adopted: And this was intended as a limitation upon the general power' conferred by the Constitution of 1834, and was regarded as a great triumph in behalf of the merchant: Journ. Con., 1870, 301, 369. In the original draft of this clause, it covered only that part of the merchant’s capital used in the purchase of goods sold to “ merchants,” and sent beyond the limits of the State. In this original form it was adopted and referred to the committee on revision, who reported it back amended by striking out the word “merchants” and inserting the words “non-residents,” so as to make it embrace sales of all kinds, when the goods were to be consumed without the limiis of the State, and in this form it became a part of the Constitution, and must be held to apply as well to retail as to wholesale merchants. It seems, however, that there has been no legislation which recognizes this exception. The defendant claims the right to this tax under the act of 1871, c.. 51, s. 2, which provides, that in addition to the ad valorem 'tax to be paid by merchants on their capital, they shall be liable and required to pay a license tax equal in amount to the ad valorem tax: Shank. Supp., 210. The act of 1870, c. 45, s. 2, had provided generally for the ad valorem tax upon the capital of the merchant, and the fifth section thereof, prescribed the license tax upon a different principle from that adopted by the act of 1871, c. 51. The latter was passed since the adoption of the Constitution of 1870, and the former before, and *498 both are silent as to the exception in favor of the capital used in the purchase of goods sold. to non-residents. It is to this fact perhaps, that this litigation is to be referred. The Legislature in ignoring the exception has left no express legislative guide to the assessor, and he is thus left to construe the law as he finds it. "While it is true, in reference to some provisions of a Constitution, that they are dormant and quiescent until some statute brings them into life and operation, yet there are others which need no legislation to give them effect. They are to be distinguished by such as confer mere discretionary powers upon the Legislature, and such as are positive limitations upon the legislative discretion — such as are mandates for legislative action, and such as are inhibitions per se. An example is cited in our own reports, of the clause in the Constitution of Mississippi, which prohibits the introduction of slaves as merchandize into that State after the first day of May, 1833. The High Court of Errors and Appeals of that State, held that this provision without legislation upon the subject executes itself: 5 How., Miss. R. . This opinion was adhered to in a subsequent case, and the doctrine was approved by this Court.
The self-executing clause of a constitution can easily be distinguished, and may be elucidated by various clauses of our bill of rights, which are vital and active as they stand, and could not derive any additional vigor from legislation. It may be illustrated, too, in the clauses now in judgment. The Legislature by one clause may tax merchants, peddlers, and *499 privileges, at its discretion — or it may not tax them at all as occupations. But as to capital employed by them, in the purchase of goods sold to non-residents, the Legislature can not impose more than the ad valorem tax. This is an inhibition per se, and executes itself. The Legislature can not violate it by positive enactment, nor can it be ignored or emasculated by the absence of legislative recognition. We hold, therefore, that the imposition of any tax upon that portion •of the merchant’s capital which is used in the purchase of goods which are sold to non-residents, and taken out of the State, is arbitrary and unlawful, and that the clause of the Constitution which forbids it, •executes itself, and must be obeyed with or without appropriate legislation on the subject.
We come now to consider the question made upon the remedy. It is said that the plaintiffs should have paid this unjust and oppressive tax under protest, and relied upon their several actions against the collector for reimbursement. It may be observed, that under the spirit of our legislation, that the right and remedy are not so intimately blended as they were at a former day — nor are exceptions which relate to the remedy, so highly favored. It might be a sufficient answer to this proposition of defendant’s counsel, to refer to certain adjudications of this Court, which . hold that taxes improperly paid, can not be recovered back by action: Dickens v. Jones, 6 Yerg., 484. In that case, the action was against the sheriff, for taxes improperly paid to him as a revenue collector. The action proceeded upon the principle, that money paid under a *500 mistake of the facts, to one not entitled to receive it, and who has no claim in conscience to retain it, may be recovered back in assumpsit: 2 Stark. Ev., 112. But the Court, per Catron, C. J., said, “we are of opinion that the money paid to the sheriff for assessed taxes, although a part thereof could not be assessed under o.ur Constitution, can not be recovered, especially after the sheriff had paid the money into the treasury”: 6 Yerg., 484. Where then was the plaintiffs remedy? The act of 1867-8, ch. 79, s. 16, is relied on by the defendant to defeat the remedy by certiorari. That section provides that no injunction or petition for mandamus, shall be granted by any Judge or Court in this State, or any bill or petition for mandamus, alleging the illegality or unconstitutionality of any of the revenue laws of’ this State, restraining any officer charged with the collection of the public taxes of the State, except upon a final hearing of any cause in the court of last resort, if an appeal should be taken to that court: Shank. Supp., 220. This extraordinary statute is the legitimate bantling of revolutionary times, and in a few brief words assumes judicial powers for the Legislature, and closes the courts of justice against the people. Without stopping to consider its constitutionality, and waiving that question, it is sufficient to say that it does not forbid the remedy by certiorari, which the law-givers doubtless saw mentioned in the organic law, as one of the great writs of right of which the people of this State could not be deprived. This writ of right was adopted into the organic law of this country, in reference to *501 its scope and functions under the common law, and in view of its efficacy as a remedy against every species of oppression exercised by inferior jurisdictions, of every kind whatever. Under the English practice, it issued out of Chancery, and sometimes out of the Kings Bench, and “lieth where the King would be certified of any record which is in the treasury,” or in the Common Pleas; or in any other court of record; or before the sheriff and coroner; or of a record before commissioners; or before the exchequer; in which cases, they may send this writ to any of the said courts or officers, to certify such record before him in banco, or in chancery, or before other justices, where the King pleaseth to have the same certified: 1 Tidds Pr., 329. And it is said that whenever a new jurisdiction is enacted by act of Parliament and the court or judge that exercises this jurisdiction, acts as a court or judge of record, according to the course of the common law, a writ of error lies on their judgments; but where they act in a summary way or in a new course different from the common law, then a writ of error lieth not — but a certiorari: 2 Tidds Pr., 1051. Such was the English idea of the remedy by certiorari — and it would seem to apply to the sheriff, coroner, commissioner, or to the action of any inferior jurisdiction which proceeded in “a summary way or in a new course different from the common law.” But this Court has said that from the earliest period, the certiorari has had given to it a much more extended application here than in England; and it has been used for purposes wholly unknown to the common *502 law. It has been adopted with us the almost universal method by which the Circuit Courts, as courts, of general jurisdiction, both civil and criminal, exercise control over all inferior jurisdiction however constituted, and whatever their course of proceeding. That the usual remedy by .the common law in cases of wrongful distress, is an action of trespass or replevin— or that either of these remedies might be resorted to here, does not by any means establish the conclusion that the certiorari under its enlarged remedial operation by our law, will not lie in a case like the present: Per McKinney, J., Mayor and Aldermen v. Pearl, 11 Hum., 252; 2 Tenn., 181; 4 Hay., 54, 69; 2 Hum., 30. And so it has been uniformly recognized as a proper remedy to avoid or correct oppression and unlawful assessments of taxes: McGrath v. Loague, 6 Cold., 340; Spears v. Loague, 6 Cold., 420. And it must be so held in this case, if the assessment in this case was a judicial act. The petition demands that the assessment be brought into Court, and that the same be adjudged unlawful. A ministerial act is that which is done under the orders of a superior — as the sheriff who obeys the mandates of the court. If an officer do an act depending on the exercise of the slightest judgment or discretion on his part, then the act is judicial — whatever may be the general functions of the officer.’ It is a judicial function to decide upon a question of individual right. A court martial exercises it in fining a man; it decides that he has forfeited that much of his money. A corporation exercises it in expelling a member. To all ' these inferior jurisdic *503 tions, said Judge Caruthers, a writ of certiorari lies from the Circuit Court, whatever be the name or organism or mode of proceeding: Car. L. S., 538. Under our statute the writ may be granted in all cases, where an inferior tribunal, board or officer exercising judicial functions has exceeded his jurisdiction or acted illegally: Code, 3123. It was said by Haywood, J., “the maxim of the law is, there is no wrong without a remedy; and it is a particular rule said he, that a certiorari will lie to all inferior jurisdictions, the proceedings of which can not be corrected by writ of error, to remove their proceedings into the superior court, to be there affirmed or quashed, or otherwise corrected as law and justice shall require”: 2 Yerg., 176, 180; 2 Sneed, 672. • It lies, say the old books, to all courts not proceeding according to the course of common law, and when without the writ ■ of certiorari, there would be no remedy against an illegal sentence: 1 Burr, 153; 2 Burr, 682; 3 Burr, 1163.
If it be then a judicial function to decide upon a question of individual right, then the defendant has done a judicial act in assessing the tax complained of. He has not only adjudged the constitutionality of the statute under which he has acted, but he has adjudged its application to these plaintiffs, and under their solemn protest, has determined that the capital used by them in the purchase of goods, sold by them to nonresidents, and sent. beyond the limits of the State, is subject to the license tax in addition to the ad valorem tax. In this judgment he has, with doubtless the most conscientious intentions, done a wrong to *504 these plaintiffs, for which the writ of certiorari affords them ample remedy.
The defendant being the assessor as well as the collector of the privilege tax, had the right to adjudicate the proper assessment under the law, and in making an assessment, he did nothing more nor less than a judicial act.
Let the several judgments be reversed and the assessments quashed. The costs will be paid by defendant out of any revenues in his hands, for which he will have a credit in his settlement.